# United States Tax Court

T.C. Memo. 2024-80

ESTATE OF RALPH W. BAUMGARDNER, JR., DECEASED,
PATRICIA L. BAUMGARDNER, PERSONAL REPRESENTATIVE,
AND PATRICIA L. BAUMGARDNER,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

—————

Docket No. 11343-19L.                                    Filed August 22, 2024.

—————

*Jay S. Block*, for petitioners.

*David A. Indek*, *Bradley C. Plovan*, *Jim Liang*, *Nancy M. Gilmore*, and
*Victoria E. Cveck*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

MARSHALL, *Judge*:  This is a collection due process (CDP) case
brought pursuant to section 6330(d),[1] in which petitioners ask this Court
to review the determination by the Internal Revenue Service (IRS)
Independent Office of Appeals (IRS Appeals)[2] to sustain a Notice CP90,
Intent to Seize Your Assets and Notice of Your Right to a Hearing (Levy
Notice), related to an income tax liability for tax year 2013 (tax year at

—————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue
Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the
*Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and
Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary
amounts are rounded to the nearest dollar.

[2] Before July 1, 2019, the IRS Independent Office of Appeals was known as the
IRS Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat.
981, 983 (2019).

[*2] issue).[3] Petitioners argue that IRS Appeals abused its discretion in denying Ralph W. Baumgardner, Jr., and Patricia L. Baumgardner's offer-in-compromise (OIC). Petitioners also contend that the settlement officer (SO) erred in calculating the Baumgardners' reasonable collection potential (RCP) by (i) determining that they were not entitled to increased health care expenses, (ii) determining that they were not entitled to additional transportation expenses, (iii) not reducing the quick sale values (QSV) of their non-income-producing properties for selling costs in the revised RCP, (iv) disallowing replacement housing and utilities expenses of $2,059 if their primary residence were sold, (v) disallowing future repair and maintenance expenses for their income-producing property in calculating the revised RCP, and (vi) including the net equity of Mr. Baumgardner's whole life insurance policy in the revised RCP. Respondent counters that IRS Appeals did not abuse its discretion in sustaining the proposed levy because (i) the Baumgardners were not entitled to increased health care expenses because they were speculative future medical costs, (ii) they were not entitled to prospective transportation ownership costs in the evaluation of their OIC because such ownership costs are excluded where they owned the vehicles and did not have any loan payments, (iii) consistent with *Internal Revenue Manual* (IRM) guidance, the SO properly included the QSV unreduced by selling costs of the non-income-producing properties in the revised RCP, (iv) any prospective repair expenses should not be used to reduce the RCP because the income-producing property was excluded from the revised RCP and such expenses are speculative, and (v) the net equity of Mr. Baumgardner's whole life insurance policy was properly included in the revised RCP because such insurance is not considered a necessary expense and because the SO determined that the equity of the insurance policy was not being used for past or current expenses and therefore would not create a hardship if liquidated.

The case was called for trial on February 13, 2023, at the Court's Baltimore, Maryland, trial session. The Court heard the parties' opening statements. The parties did not offer any testimony. The facts stated below are based on the parties' First Stipulation of Facts, which was admitted into evidence. In the First Stipulation of Facts the parties

---

[3] On April 19, 2024, petitioners filed a Motion to Amend Order, asking the Court to set aside our August 24, 2021 Order "that so much of this case as it relates to tax year 2012 is dismissed for lack of jurisdiction." For the reasons stated in the Court's August 24, 2021 Order, petitioners' Motion will be denied. *See, e.g., Gallagher v. Commissioner*, T.C. Memo. 2018-77, at *9–10.

[*3] stipulated facts of the CDP hearing and the documents generated during that hearing to produce the administrative record. For the reasons stated below, we hold that IRS Appeals did not abuse its discretion in rejecting the Baumgardners' OIC and in sustaining the Levy Notice.

FINDINGS OF FACT

The Baumgardners resided in Maryland when they filed the Petition. Mr. Baumgardner died on September 26, 2022. Mrs. Baumgardner was appointed as the personal representative of the Estate of Ralph W. Baumgardner, and on February 7, 2023, this Court granted her Motion to Substitute Parties and Change Caption.

I.  *The Baumgardners' Income Tax Liability*

On October 16, 2016, the Baumgardners filed late their Form 1040, U.S. Individual Income Tax Return, for the 2012 tax year. They filed a married filing joint return and claimed their adult son, Ralph Baumgardner III (Ralph III), as a dependent.[4] On their 2012 Form 1040 income tax return, they reported total tax due of $59,988 and claimed a tax credit of $36. Because they failed to timely file the 2012 Form 1040 income tax return and timely pay the amount shown on the return, respondent determined additions to tax, pursuant to sections 6651(a)(1) and (2) and 6654, of $13,489, $13,489, and $9,062, respectively. As of June 1, 2020, a balance due of $114,504 remained for the 2012 tax year.

The Baumgardners also filed late their Form 1040 income tax return for the 2013 tax year on October 16, 2016. They filed a married filing joint return and claimed their son, Ralph III, as a dependent. On their 2013 Form 1040 income tax return, they reported total tax due of $3,266 and claimed a tax credit of $1,000. Since they failed to timely file the 2013 Form 1040 income tax return and timely pay the tax amount shown on the return, respondent determined additions to tax, pursuant to sections 6651(a)(1) and (2) and 6654, of $510, $349, and $41,

---

[4] The Baumgardners' OIC submission included a copy of a February 13, 2015 Social Security Administration (SSA) letter denying Ralph III's claim for Supplemental Security Income benefits. The SSA letter references psychological and medical reports that were prepared by medical professionals who evaluated Ralph III and that Ralph III attached to his benefits claim. The Baumgardners informed IRS Appeals that Ralph III was unable to work because of his health challenges and that they provided more than half of his support.

[*4] respectively. As of June 28, 2021, a balance due of $4,251 remained for the tax year at issue.

II.    *Collection Activity*

The Baumgardners did not pay the liabilities for the 2012 tax year or the tax year at issue, and respondent began collection activities. On May 1, 2017, respondent sent the Levy Notice, stating that they owed $3,497 in an unpaid federal income tax liability for the tax year at issue and that they had 30 days from the date of the letter to pay the amount due in full or request a CDP hearing.

III.   *CDP Hearing Request*

The Baumgardners timely submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing, for the tax year at issue, with a signature date of May 25, 2017. Respondent received it on May 30, 2017. Form 12153 directs the taxpayer to check the most appropriate box for the reason the taxpayer disagrees with the filing of a notice of federal tax lien filing or a proposed levy. The form provides four options: (i) collection alternative, (ii) installment agreement, (iii) OIC, or (iv) "I cannot pay balance." The Baumgardners did not check a box indicating a basis for their disagreement with the proposed collection action. However, they circled "collection alternative" and cross-referenced and made the following statement on line 8 of the Form 12153: "We are currently compiling the information necessary in preparing a complete and accurate 433A & 433B. Said forms will allow us to determine whether an installment agreement or offer in compromise is the collection alternative."

IV.    *The Baumgardners' OIC*

On July 11, 2017, the Baumgardners submitted an OIC based on effective tax administration (ETA) that consisted of (i) a Form 656, Offer in Compromise, (ii) a Form 433–A, Collection Information Statement for Wage Earners and Self-Employed Individuals, with supporting documentation, and (iii) a three-page narrative explaining what they asserted were their special circumstances that they believed qualified them for an OIC based on ETA. In their Form 656, they offered to settle their outstanding income tax liability of $103,241 for the 2012, 2013, and 2014 tax years for a lump-sum cash payment of $1,825 (offer amount). They proposed to pay the offer amount in separate installments: $915 one month after respondent's acceptance and $910 two months later. In the attachment, they explained that their monthly

[*5] ordinary and necessary expenses exceeded their monthly income, they have significant debt, and that, even if the assets that were excluded from their OIC were liquidated to full pay their 2013 income tax liability, they would suffer economic hardship because they would be unable to meet their basic living expenses for the remainder of their joint life expectancy of not less than 15 years.

In the Form 433–A they submitted as part of their OIC, the Baumgardners detailed their monthly income and expenses, as well as their assets and liabilities for purposes of calculating their RCP. They reported that they had a total monthly income of $3,097 consisting of $1,840 in Social Security income and $1,257 in net rental income. They further reported that they had total monthly living expenses of $4,292. They also reported personal assets of $357,985, consisting of several bank accounts, an individual retirement account (IRA), two life insurance policies, three automobiles, and three real estate properties. Each of the three real estate properties was in Westminster, Maryland. One of these properties (114 E.) was used in part as their personal residence, and in part as a rental property. The other two were exclusively rental properties (116 E. and 137). While 116 E. was an income-producing asset, 114 E. and 137 were not. Neither 114 E. nor 137 was sold or had a sale pending when the Baumgardners' OIC was under consideration.

By letter dated August 7, 2017, respondent notified the Baumgardners that he had received their OIC. On August 31, 2017, IRS Appeals SO D. Bartholomew notified them by letter that IRS Appeals had received their OIC and that respondent was suspending their request for a CDP hearing during the pendency and review of their OIC. The OIC was initially reviewed by respondent's Offer Examiner P. Goetz (OE Goetz).

OE Goetz reviewed the Baumgardners' financial information and prepared an OIC Financial Analysis Report (OIC Report). In the OIC Report OE Goetz determined that they had total assets, and therefore an RCP, of $354,241. OE Goetz recommended rejecting their offer amount because she determined that they had an RCP of $354,241 and the ability to fully pay their tax liability based on equity in assets. On April 6, 2018, OE Goetz notified the Baumgardners and their counsel by letter that respondent had made a preliminary decision to reject their OIC because they had the ability to fully pay their federal tax liability

[*6] within the collection period expiration date.[5] OE Goetz's letter also stated that their special circumstances did not constitute a hardship that warranted acceptance of their OIC. Because they had requested a CDP hearing, OE Goetz's preliminary determination was forwarded to IRS Appeals for consideration and final determination.

V.  *CDP Hearing*

The Baumgardners' CDP hearing was initially assigned to SO Bartholomew. On February 22, 2019, their counsel and SO Bartholomew held a telephone conference and discussed their assets, including the three real estate properties. Their counsel explained to SO Bartholomew that expenses exceeded income for two of the properties, 114 E. and 137, and that the rental income from the income-producing property, 116 E., was used to pay their basic living expenses. SO Bartholomew stated that she would consider their counsel's arguments as to the inclusion of the properties in the table of assets and available equity in those assets for purposes of evaluating their OIC.

On March 11, 2019, the case was transferred to SO D. Connolly. On March 27, 2019, SO Connolly held a telephone conference with the Baumgardners' counsel and discussed the properties and their other assets, including Mrs. Baumgardner's IRA. On March 27 and April 5, 2019, their counsel and SO Connolly exchanged correspondence, and he sent SO Connolly additional documentation regarding the real estate properties in support of their OIC based on ETA. This correspondence, along with the narrative that was attached to the Baumgardners' Form 656, focused on excluding assets from the RCP including the real estate properties, automobiles, Mrs. Baumgardner's IRA, and the surrender value of a whole life insurance policy on Ralph III. On April 5, 2019, SO Connolly called their counsel and explained that even if the rental properties were excluded from their assets for purposes of the RCP calculation, they would still have sufficient assets to fully pay their tax liability and would not be considered for an OIC based on ETA. On April 5, 2019, the SO received a letter from their counsel that included a table of their assets. The assets listed on the table included Mrs. Baumgardner's IRA, the surrender value of a whole life insurance policy on Ralph III's life, the surrender value of a separate whole life insurance policy on Mr. Baumgardner's life, a bank account, the three real estate

_____

[5] We note that OE Goetz and the Baumgardners engaged in several communications before OE Goetz's April 6, 2018 preliminary decision to reject their OIC wherein they provided her with additional documentation to support the income, expenses, and assets that they listed on their Form 433–A.

[*7] properties, and their vehicles. The total value of these assets was $291,854. However, their counsel reiterated his position that none of these assets should be considered of value for inclusion in the RCP except for the surrender value of the whole life insurance policy on Ralph III's life. During the CDP hearing, their counsel also reiterated that if the assets that were excluded from their OIC were liquidated to fully pay their 2013 income tax liability, they would suffer economic hardship because they would be unable to meet their basic living expenses for the remainder of their respective life expectancies.

On May 28, 2019, SO Connolly issued the Baumgardners the Notice of Determination Concerning Collection Actions under IRC Sections 6320 or 6330 of the Internal Revenue Code (Notice). The attachment to the Notice provided additional background on the Baumgardners and their medical conditions.[6] It stated that Mr. Baumgardner was forced to retire because of medical disability and Mrs. Baumgardner was unable to work because of physical injury. More specifically, it stated that Mr. Baumgardner was "forced to retire due to imbalance due to spinal issues, morbid obesity and diabetes." It also stated that Mrs. Baumgardner incurred injuries in 2016 for a "fractured knee, shoulder, [p]elvic collapse, bursitis, arthritis, and a herniated disc." Mrs. Baumgardner applied for SSA disability benefits, but the SSA denied her claim, stating that she should be healed and able to return to work by June 2017.

The Baumgardners' adult dependent son was living with them, and they were providing more than half of his living expenses. An IRS Appeals technical advisor reviewed their Form 433–A and agreed to remove the equity from two of their real estate properties from the RCP because the sale of the first would increase their housing expense while also eliminating some rental income and the sale of the second would eliminate an income-producing property. However, the IRS Appeals technical advisor concluded that the RCP from their bank accounts, life insurance, IRA, and cars still exceeded the balance due. SO Connolly offered them penalty abatement for the 2012 tax year and an $850-per-month installment agreement. Their counsel rejected SO Connolly's offer, at which point SO Connolly explained that he would receive a closing letter in the mail.

---

[6] When respondent issued the Notice, Mr. Baumgardner was 71 years old and Mrs. Baumgardner was 64 years old.

**[\*8]**   SO Connolly reviewed the Baumgardners' file and verified that all requirements of applicable law and administrative procedure were satisfied.  The Notice stated that the only issue that they raised was a collection alternative but, because they had the ability to pay their liability in full and there were no special circumstances, IRS Appeals could not accept their offer amount.  Accordingly, SO Connolly determined that the issuance of the Levy Notice was appropriate and sustained the proposed collection action.

VI.   *Tax Court Proceedings*

On June 27, 2019, the Baumgardners timely filed their Petition with this Court seeking our review of IRS Appeals' determination to deny them a collection alternative and sustain the proposed levy.  On July 7, 2020, respondent filed a Motion to remand the case to IRS Appeals.  Respondent sought remand because the administrative record did not show that respondent's SO had verified whether the Baumgardners met the requirements for an OIC based on ETA as outlined in Treasury Regulation § 301.7122-1 and IRM 5.8.11 (Aug. 5, 2015) and 8.23.3 (Aug. 18, 2017).  On August 31, 2020, the Court granted respondent's Motion to Remand and ordered the case remanded to IRS Appeals for a supplemental CDP hearing to consider the Baumgardners' economic hardship argument.

The supplemental CDP hearing was assigned to SO C. Covey.  On December 6, 7, and 8, 2020, the Baumgardners' counsel sent documents to SO Covey to support their economic hardship argument.  These documents addressed their assets, income, future vehicle replacement expenses,[7] future out-of-pocket health expenses,[8] and future repair and maintenance expenses relating to their three real estate properties.

On January 20, 2021, SO Covey sent the Baumgardners' counsel a letter stating that, based on the documentation submitted, IRS Appeals determined that they qualified for ETA consideration because

---

[7] The Baumgardners asserted that replacement of two of their vehicles would cumulatively result in $59,640 of additional transportation expenses.

[8] Specifically, the Baumgardners asserted that they reasonably believed that their medical challenges would worsen with age, that new medical issues would arise, and that their out-of-pocket medical costs, deductibles, and copays would increase by no less than 3% annually.  They cited an article on the rising costs of health care.  Relying on that article they told SO Covey that their health care expenses would exceed the $228 monthly out-of-pocket health care expense that OE Goetz initially allowed by $78 per month (totaling $14,040 over their joint life expectancy of not less than 15 years).

[*9] of economic hardship. As a result, IRS Appeals reevaluated their assets[9] and future income potential and recalculated their RCP at $109,605.[10] Specifically, SO Covey decreased the RCP of $354,204 to $109,605 by allowing them to retain net available equity of $244,599 from (i) one of their real estate properties, (ii) Mrs. Baumgardner's IRA account, and (iii) two of their automobiles. SO Covey took their negative net monthly income into account in allowing them to retain net available equity of $244,599. Specifically, as part of the RCP calculation, SO Covey allowed them to retain $1,359 in net equity in assets per month for a 15-year period ($244,599 in net equity retained). This allowance resulted in the Baumgardners' having $40 of positive net monthly income, and it covered their current and future necessary living expenses.

On January 30, 2021, the Baumgardners' counsel sent a letter to SO Covey's manager, D. Richardson (ATM Richardson), stating that they were unable to borrow money against their real estate properties. In support of that position, their counsel directed ATM Richardson and SO Covey to a rejection letter from a conventional lender that was included with his December 5, 2020 correspondence, and he attached documents from two reverse mortgage lenders stating that they do not qualify for a reverse mortgage. Only one of the reverse mortgage application denials identifies the subject property address (114 E.) on which the applicant was seeking to obtain a reverse mortgage. The other reverse mortgage application denial does not state the subject property address on which the reverse mortgage was sought. On February 1, 2021, their counsel sent a letter to ATM Richardson and SO Covey stating that IRS Appeals' determination that their RCP was $109,605 was arbitrary "because it is based on a fundamentally flawed analysis." Their counsel reiterated that IRS Appeals failed to consider the foreseeable economic consequences relating to their future increased

---

[9] As discussed above, the Baumgardners argued that IRS Appeals should not have included the surrender value of the whole life insurance policy on Mr. Baumgardner in the RCP. SO Covey used the insurance policy's net account value less loan and loan interest amounts to reach the net equity for purposes of the revised RCP. We note that this amount was less than each of (i) the cash surrender value of the policy or (ii) the loan amount available.

[10] SO Covey's RCP determination was primarily based on equity in assets; however, she considered their negative monthly income and reduced the RCP based on ETA issues to allow them to retain net equity in certain assets to satisfy their current and future necessary living expenses.

[*10] out-of-pocket health care expenses,[11] vehicle replacement expenses,[12] and real estate considerations.[13] ATM Richardson explained to the Baumgardners' counsel that SO Covey considered these future expenses and rejected them because they were speculative. He further specifically explained that in calculating the Baumgardners' RCP, IRS Appeals made reasonable allowances (by allowing them to retain $244,599 in net equity in assets) for them to meet their present and future basic living expenses in light of the fact that they currently have negative net monthly income.

On February 26, 2021, IRS Appeals issued the Supplemental Notice of Determination (Supplemental Notice) for the tax year at issue. In the Supplemental Notice SO Covey stated that she had verified that the requirements of any applicable law or administrative procedure were met. SO Covey reviewed the administrative file and confirmed proper issuance of the notice and demand, Levy Notice, and notice of a right to a CDP hearing. SO Covey also confirmed that an assessment was properly made for the tax period identified on the CDP notice. She also confirmed that the notice and demand for payment was mailed to the Baumgardners' last known address and that there was a balance due when the Levy Notice was issued. Next SO Covey reaffirmed respondent's determination that the issuance of the Levy Notice was valid and appropriate. Before issuing the Supplemental Notice, SO Covey requested that they increase the offer amount from $1,825 to

---

[11] SO Covey reviewed the Baumgardners' health care expenses and, for purposes of the income expense table and the RCP, allowed their reported out-of-pocket health care expense of $215 per month and allowed a health care insurance expense of $539 per month. The health care insurance expense consisted of their claimed $422 per month health insurance expense and an additional health insurance expense of $117 per month that SO Covey allowed. SO Covey disallowed their claim of an additional $78 per month in projected health care expense.

[12] For purposes of the income expense table and the RCP, SO Covey allowed them $506 per month in car operation expense plus an additional $400 per month ($200 per car) because of the age and mileage of the vehicles, for a total of $906 in monthly transportation expenses.

[13] The Baumgardners assert that, over the next 15 years, 116 E. would require $116,275 in future repairs to maintain the property's building components. The repairs included boiler replacement, plumbing repairs, sidewalk replacement, laundry machine replacement, window air conditioner unit replacement, painting, siding replacement, roof replacement, garage roof replacement, fire escape post base replacement, driveway water runoff remediation, storm door replacement, installation of railings, installation of weed retention pavers, kitchen appliance and cabinet replacement, vinyl siding and trim replacement, exterior rear door replacement, downspout repairs, and garage door replacement.

**[\*11]** $109,605. They declined to submit any amended offer. Because the offer amount was less than their ability to pay, IRS Appeals rejected the offer amount and sustained the Levy Notice. In an attachment to the Supplemental Notice SO Covey summarized the parties' communications and the factors that IRS Appeals considered with respect to their OIC based on ETA.

## OPINION

The question before the Court is whether the SO abused her discretion in rejecting the Baumgardners' OIC and sustaining respondent's proposed levy with respect to their 2013 federal tax liability. Specifically, petitioners argue that the SO erred in understating out-of-pocket health care costs, vehicle expenses, and maintenance expenses for their three real estate properties.

### I. *Standard of Review*

We have jurisdiction to review IRS Appeals' determination pursuant to section 6330(d)(1). *See Murphy v. Commissioner*, 125 T.C. 301, 308 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006). Where, as here, the underlying tax liability is not at issue, we review the determination of IRS Appeals for abuse of discretion. *See Sego v. Commissioner*, 114 T.C. 604, 610 (2000); *Goza v. Commissioner*, 114 T.C. 176, 182 (2000). When this Court remands a case to IRS Appeals and there is a supplemental determination, we review the supplemental determination. *Hoyle v. Commissioner*, 136 T.C. 463, 467–68 (2011), *supplementing* 131 T.C. 197 (2008).

In reviewing for abuse of discretion we must uphold IRS Appeals' determination unless it is arbitrary, capricious, or without sound basis in fact or law. *See Murphy*, 125 T.C. at 320; *Taylor v. Commissioner*, T.C. Memo. 2009-27, 97 T.C.M (CCH) 1109, 1116. We do not substitute our judgment for that of IRS Appeals but consider "whether, in the course of making its determination, the [IRS] Appeals Office complied with the legal requirements of an administrative hearing." *Charnas v. Commissioner*, T.C. Memo. 2015-153, at \*7.

### II. *Abuse of Discretion*

Petitioners assert that SO Covey abused her discretion in sustaining the proposed collection action and rejecting their OIC of $1,825. They also assert that SO Covey abused her discretion because the proposed collection action does not balance the need for the efficient

[*12] collection of taxes and their legitimate concerns that the collection action be no more intrusive than necessary. In deciding whether IRS Appeals abused its discretion, we consider whether SO Covey (a) properly verified that the requirements of applicable law or administrative procedure have been met, (b) considered any relevant issues the Baumgardners raised, and (c) weighed "whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of [the Baumgardners] that any collection action be no more intrusive than necessary." *See* § 6330(c)(3). Our review of the record establishes that SO Covey satisfied each of these requirements.

A.    *Verification*

Before issuing a notice of determination, IRS Appeals must verify that all requirements of applicable law and administrative procedure have been met. § 6330(c)(1), (3)(A). We have authority to review an SO's satisfaction of the verification requirement regardless of whether the taxpayer raised the issue at the CDP hearing. *Hoyle*, 131 T.C. at 200–03.

The Petition did not assert that SO Covey failed to satisfy this requirement, and petitioners have not directed this Court's attention to any facts that would support such a finding. *See* Rule 331(b)(4) ("Any issue not raised in the assignments of error shall be deemed to be conceded."); *Rockafellor v. Commissioner*, T.C. Memo. 2019-160, at *12. Nonetheless, we briefly address the verification requirement. SO Covey reviewed the administrative file and confirmed proper issuance of the notice and demand, Levy Notice, and notice of a right to a CDP hearing. SO Covey also confirmed that an assessment was properly made for the 2013 tax year. She also confirmed that the notice and demand for payment was mailed to the Baumgardners' last known address and that there was a balance due when the Levy Notice was issued. Based on our review of the record before us, we find that SO Covey satisfied the verification requirement. *See* § 6330(c)(1).

B.    *Issues Raised*

1.    *Legal Background*

Petitioners argue that respondent abused his discretion by rejecting the OIC. On the Baumgardners' Form 656, which was based on ETA, they offered to settle their outstanding income tax liability of $103,241 for the 2012, 2013, and 2014 tax years for a lump-sum cash

[*13] payment of $1,825. Their OIC-ETA collection alternative was based on their contention that they would suffer economic hardship if their assets were used to pay their federal tax liabilities.

The crux of the Baumgardners' economic hardship assertion was that because of their respective ages and life expectancies (at the time respondent issued the Notice, Mr. Baumgardner was 71 years old and Mrs. Baumgardner was 64 years old), inability to work due to health issues, and obligation to support their adult son, Ralph III, and because their monthly expenses exceeded their income, they required all the net equity in their assets, $354,204, to pay their necessary and basic living expenses for at least the period of their joint life expectancy of not less than 15 years. They further asserted that their basic living expenses included increased future out-of-pocket health care expenses, additional transportation expenses that included future vehicle replacement costs for two of their vehicles, and future maintenance and component replacement for their real estate properties. Petitioners argue that SO Covey's failure to take these foreseeable and necessary expenses into account in considering their OIC was an abuse of discretion. Their arguments that IRS Appeals erred in not allowing greater amounts for certain future expenses goes to their assertion that certain assets should have been excluded from SO Covey's RCP determination and that their $1,825 OIC reflects the amount the IRS could collect from them without causing economic hardship.

Section 7122(a) authorizes the IRS to compromise an outstanding tax liability on grounds that include the promotion of ETA, the ground that the Baumgardners asserted in IRS Appeals. *See* Treas. Reg. § 301.7122-1(b)(3), (c)(3). The decision to accept or reject an OIC, along with the terms of the compromise, is within the IRS's discretion and is based upon consideration of all facts and circumstances. *See* § 7122(a); Treas. Reg. § 301.7122-1(c)(1). However, the IRS may reject an OIC when the taxpayer's RCP exceeds his offer. *See Johnson v. Commissioner*, 136 T.C. 475, 486 (2011), *aff'd*, 502 F. App'x 1 (D.C. Cir. 2013). Generally, the IRS will reject any offer substantially below the taxpayer's RCP unless special circumstances justify acceptance of such an offer. *See Abraham v. Commissioner*, T.C. Memo. 2021-97, at *13 (first citing *Mack v. Commissioner*, T.C. Memo. 2018-54, at *10; and then citing Rev. Proc. 2003-71, § 4.02(2), 2003-2 C.B. 517, 517). A taxpayer's RCP is determined, in part, using published guidelines for certain national and local allowances for basic living expenses and essentially treating income and assets in excess of those needed for basic living expenses as available to satisfy federal tax liabilities. *See*

**[\*14]** *Lemann v. Commissioner*, T.C. Memo. 2006-37, 91 T.C.M. (CCH) 846, 850.

The IRM provides procedures for analyzing a taxpayer's financial condition to determine RCP. *See* IRM 5.8.5.1 (Mar. 23, 2018). A taxpayer's RCP is calculated by determining, then adding together: (1) the taxpayer's "net realizable equity," i.e., the quick sale value of the taxpayer's assets less amounts owed to secured lien holders with priority over federal tax liens, and (2) his "future income," i.e., the amount collectible from the taxpayer's expected future gross income after allowing for necessary living expenses. *See* IRM 5.8.5.4.1 (Sept. 30, 2013); *id.* 5.8.5.18 (Mar. 23, 2018); *see also Johnson*, 136 T.C. at 485; *Lemann*, 91 T.C.M. (CCH) at 850.

When an SO has followed the IRS's guidelines to ascertain a taxpayer's RCP and rejected the taxpayer's proposed collection alternative on that basis, we have found no abuse of discretion. *See Murphy*, 125 T.C. at 321; *Lemann*, 91 T.C.M. (CCH) at 851. In reviewing the SO's determination, we do not make an independent evaluation of what would be an acceptable collection alternative. *See Thompson v. Commissioner*, 140 T.C. 173, 179 (2013); *Murphy*, 125 T.C. at 320; *see also Randall v. Commissioner*, T.C. Memo. 2018-123, at \*9. "If the settlement officer followed all statutory and administrative guidelines and provided a reasoned, balanced decision, the Court will not reweigh the equities." *Thompson*, 140 T.C. at 179; *see also Lipson v. Commissioner*, T.C. Memo. 2012-252, at \*9.

"[W]e judge the propriety of [IRS Appeals'] determination . . . on the grounds invoked by [IRS] Appeals." *Elkins v. Commissioner*, T.C. Memo. 2020-110, at \*24; *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Antioco v. Commissioner*, T.C. Memo. 2013-35, at \*25 ("Applying *Chenery* in the CDP context means that we can't uphold a notice of determination on grounds other than those actually relied upon by the Appeals officer."). In doing so, we look to the reasons offered in the notice of determination, as further explained in the SO's contemporaneous rejection memorandum and case activity notes. *Accord Melasky v. Commissioner*, 151 T.C. 93, 106 (2018) ("[W]e will uphold a notice of determination of less than ideal clarity if the basis for the determination may reasonably be discerned . . . ."), *aff'd*, 803 F. App'x 732 (5th Cir. 2020); *Kasper v. Commissioner*, 150 T.C. 8, 24–25 (2018) ("Although we may not accept any *post hoc* rationalizations for agency action provided by the Commissioner's counsel, we may consider any 'contemporaneous explanation of the agency decision' contained in the

15

[*15] record." (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738–40 (D.C. Cir. 2001))); *see Elkins*, T.C. Memo. 2020-110, at *25–29.

### 2. *The Baumgardners' OIC*

A settlement to promote effective tax administration is justified (i) when it is determined that full collection could be achieved but would "cause the taxpayer economic hardship within the meaning of [Treasury Regulation] § 301.6343-1," or (ii) when exceptional circumstances exist such that collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner. Treas. Reg. § 301.7122-1(b)(3)(i) and (ii); *see also Bogart v. Commissioner*, T.C. Memo. 2014-46, at *10. Before IRS Appeals, the Baumgardners agreed that their request for an OIC-ETA was not based on Treasury Regulation § 301.7122-1(b)(3)(i) (i.e., public policy). Accordingly, their CDP hearing and supplemental CDP hearing focused on whether the IRS's collection of the tax would create economic hardship for them.

In the Supplemental Notice, SO Covey determined that the Baumgardners qualified for ETA consideration under economic hardship and reevaluated their assets and future income potential. As a result of that reevaluation, SO Covey decreased the RCP of $354,204 to $109,605 by allowing them to retain net available equity of $244,599 from (i) one of their real estate properties, (ii) Mrs. Baumgardner's IRA account, and (iii) two of their automobiles. However, SO Covey determined that exceptional circumstances did not exist to warrant acceptance of their OIC because their offer amount was less than the revised RCP, and the revised RCP allowed them to retain the net equity in assets to subsidize their negative net monthly income and cover their necessary and basic living expenses over a 15-year period. In other words, under the IRS's RCP calculation, collection of the tax would not create an economic hardship. *See* Treas. Reg. § 301.6343-1. Below we consider their claims of economic hardship.

"An offer to compromise based on economic hardship generally will be considered acceptable when, even though the tax could be collected in full, the amount offered reflects the amount the Service can collect without causing the taxpayer economic hardship." Rev. Proc. 2003-71, § 4.02(3)(a), 2003-2 C.B. 517, 517; *see Dailey v. Commissioner*, T.C. Memo. 2008-148, 95 T.C.M. (CCH) 1582, 1590. Treasury Regulation § 301.6343-1(b)(4) defines economic hardship as the inability to pay reasonable basic living expenses. *See also Gustashaw v.*

[*16] *Commissioner*, T.C. Memo. 2018-215, at *15–16. Treasury Regulation § 301.7122-1(c)(3) sets forth the following nonexhaustive list of factors that an SO may take into account that would support (but are not conclusive of) a finding of economic hardship: (i) a long-term illness, medical condition, or disability which is expected to exhaust the taxpayer's financial resources, (ii) the total depletion of a taxpayer's income resulting from the provision of dependent care, and (iii) the taxpayer's inability to borrow against the equity in the taxpayer's assets and liquidation of those assets to pay the outstanding tax liability would render the taxpayer unable to meet basic living expenses. Below, we discuss the Baumgardners' expenses that SO Covey disallowed in rejecting their OIC-ETA based on economic hardship and that petitioners argue resulted in an abuse of discretion.

### a. *Future Health Care Expenses*

First, the Baumgardners asserted to SO Covey that they were entitled to increased health care expenses because of their medical conditions and ages. Specifically, they asserted that they reasonably believed that their medical challenges would worsen with age, that new medical issues would arise, and that their out-of-pocket medical costs, deductibles, and copays would increase by no less than 3% annually. They cited an article on the rising costs of health care. Relying on that article, they told SO Covey that their health care expenses would exceed the $228 monthly out-of-pocket health care expense that OE Goetz initially allowed by $78 per month (totaling $14,040 over their joint life expectancy of not less than 15 years). As a result, they asserted that SO Covey had erred in disallowing an increase to their out-of-pocket health care expenses and that SO Covey should have allowed an increase to their out-of-pocket health care expense by $78 per month. In effect, they argued that IRS Appeals should have taken future increased out-of-pocket health care expenses into account because the expenses would affect their future financial wherewithal (i.e., if the tax were collected, it would cause them economic hardship in meeting these future expenses).

Under the IRM, taxpayers are entitled to out-of-pocket health care expenses. The out-of-pocket health care standard amount is allowed in addition to the amount taxpayers pay for health insurance. IRM 5.15.1.9(6) and (7) (Aug. 29, 2018). SOs are directed to allow taxpayers the standard amount of healthcare expenses monthly on a per person basis without questioning the amounts actually spent by taxpayers on healthcare costs. *Id.*; IRM 5.8.5.22.4(6) (Mar. 23, 2018).

[*17] Amounts in excess of the out-of-pocket health care standard may be allowed if taxpayers provide documentation to substantiate and justify the additional health care expenses. IRM 5.15.1.9(8). Additionally, when confronted with special circumstances, the SO must take into account any long-term illnesses, medical conditions, disabilities, and care for dependents with special health needs. *Gustashaw*, T.C. Memo. 2018-215, at *25 (citing Treas. Reg. § 301.7122-1(c)(3)). However, an SO does not abuse his or her discretion in disallowing speculative future medical costs. *See Brombach v. Commissioner*, T.C. Memo. 2012-265, at *24–25; *Blondheim v. Commissioner*, T.C. Memo. 2006-216, 92 T.C.M. (CCH) 334, 338, *aff'd in part sub nom. Keller v. Commissioner*, 568 F.3d 710 (9th Cir. 2009).

In *Gustashaw*, T.C. Memo. 2018-215, at *26, we rejected the same argument that petitioners make here. Specifically, we held that IRS Appeals did not abuse its discretion in denying future health care expenses based on the taxpayers' argument that medical expenses increase as people age. *Id.* "It is not an abuse of discretion for a settlement officer to set aside speculative future expenses if the record does not support their inclusion." *Id.* (citing *Brombach*, T.C. Memo. 2012-265, at *24–25). SO Covey reviewed the Baumgardners' health care expenses and allowed their reported out-of-pocket health care expense of $215 per month and allowed a health care insurance expense of $539 per month. The health care insurance expense consisted of their reported $422 per month health insurance expense and an additional health insurance expense of $117 per month that SO Covey allowed. They reported an additional $78 per month of out-of-pocket health care expense based on their position that their health care expenses would increase by no less than 3% per year and the expenses would be further increased by their current and future medical problems. As discussed *supra* note 11, SO Covey considered their claim for an additional $78 per month in health care expense (above the additional $117 per month in health care expense that SO Covey allowed) and rejected it because it was speculative. SO Covey did not abuse her discretion in disallowing their claimed additional $78 per month of out-of-pocket health care expense because it was an unsubstantiated and speculative future expense. *See Gustashaw*, T.C. Memo. 2018-215, at *26. Finally, we note that even if SO Covey had allowed the reported $78 per month health care expense, it would have resulted in a reduction of $14,040 ($78 × 12 months × 15 years) to their RCP or $95,565 ($109,605 − $14,040). However, a revised RCP of $95,565 still greatly exceeds their offer amount.

**[\*18]**                    b.        *Additional Transportation Expenses*

The Baumgardners also asserted to SO Covey that they were entitled to increased transportation ownership expense because it was reasonably foreseeable and expected that during their joint life expectancy of not less than 15 years they would need to replace two of their vehicles.  They asserted that replacement of two of their vehicles would cumulatively result in $59,640 of additional transportation expense.  Finally, they asserted additional transportation ownership expense for the vehicle used for Ralph III's welfare and health care appointments.

SO Covey allowed the Baumgardners $506 per month in car operation expense plus an additional $400 per month ($200 per car) because of the age and mileage of the vehicles, for a total of $906 in monthly transportation expense.  They assert that SO Covey abused her discretion in not permitting them an additional car expense of $35,640 (i.e., the $59,640 vehicle replacement cost reduced by $24,000 (allowed monthly car expense multiplied by 60 months)).

An SO is required to factor in the taxpayers' necessary transportation expenses in computing their RCP.  IRM 5.8.5.22.3(1) (Mar. 23, 2018), 5.15.1.8(5) (July 24, 2019).  Transportation expenses are necessary if "they are used by taxpayers and their families to provide for their health and welfare and/or the production of income."  *Id.* 5.8.5.22.3(1).  Transportation expenses include ownership expenses for the purchase or lease of a vehicle and operating expenses to keep the vehicle on the road.  *Id.* 5.8.5.22.3(2)–(4).  A taxpayer is allowed operating expenses under the local transportation standard, or the amount reported by the taxpayer, whichever is less.  *Id.* 5.8.5.22.3(4). Substantiation for the operating expense allowance is not required unless the amount reported is more than the total allowed under the transportation standards.  *Id.*  For instance, a taxpayer that reports an amount greater than the transportation standard may be allowed an amount greater than the standard if the taxpayer commutes long distances to reach the taxpayer's place of employment.  *Id.* 5.8.5.22.3(5).

For ownership expenses a taxpayer is "allowed the local standard or the amount actually paid, whichever is less, unless the taxpayer provides documentation to verify and substantiate that the higher expenses are necessary."  IRM 5.8.5.22.3(3).  If a taxpayer owns a car but has no car payment, only the operating costs portion of the transportation standard is used to calculate the allowable

**[\*19]** transportation expense. *Gustashaw*, T.C. Memo. 2018-215, at \*27; IRM 5.15.1.8(5)(b). However, considering the taxpayer's income that may be available for purposes of the RCP, a taxpayer may be allowed an allowance for a loan payment if the taxpayer provides evidence that the vehicle will require immediate replacement because of its age or condition. IRM 5.8.5.22.3(3). If the taxpayer has a vehicle that is currently over eight years old or has reported mileage of 100,000 miles or more, an additional monthly operating expense of $200 is generally allowed per vehicle (up to two vehicles when a joint offer is submitted). IRM 5.8.5.22.3(6). Written documentation is not required to determine the exact additional operating costs if the vehicle meets the age or mileage threshold, unless the additional allowance exceeds the $200 provided. *Id*.

As discussed *supra* note 12, SO Covey allowed the Baumgardners $506 per month in transportation operating expense and an additional $400 per month ($200 per car) operating expense because of the age and mileage of the vehicles. Their primary complaint with respect to transportation expense was that SO Covey did not permit any ownership expense and did not take into account that two of their vehicles would need to be replaced during their remaining joint life expectancy of not less than 15 years. As we discussed *supra* Part II.B.2.a. with respect to future health care expenses, their argument seems to be that IRS Appeals should have taken these ownership expenses into account because the expenses would affect their future financial wherewithal (i.e., if the tax were collected it would cause them economic hardship in meeting these future expenses).

The record shows that SO Covey considered these expenses but rejected them for purposes of modifying the RCP because they were future speculative expenses. As discussed *supra* note 10, SO Covey's RCP determination was based on equity in assets; however, she considered the Baumgardners' negative monthly income[14] and reduced the RCP based on ETA issues to allow them to retain net equity in certain assets to cover their current and future necessary living expenses. SO Covey's decision to allow them to retain $244,599 in net asset equity (or $1,359 per month for 15 years) reflects her determination that this amount was required to meet their substantiated and unspeculative current and future expenses.

---

[14] The Baumgardners' $906 per month transportation expense is a portion of their negative net monthly income.

**[\*20]** SO Covey followed IRM guidance in allowing for transportation ownership and operating expenses in her evaluation of the OIC-ETA. But for an exception that is inapplicable here,[15] the IRM does not allow for vehicle replacement expense where the taxpayer does not have a vehicle payment. There is no abuse of discretion when an IRS Appeals officer relies on IRM guidance. *See Gustashaw*, T.C. Memo. 2018-215, at \*28 n.44 (and cases cited thereat). Finally, petitioners have not directed the Court to any document in the administrative record that substantiates any additional current transportation ownership expenses for the vehicle used for Ralph III's welfare and health care appointments. SO Covey did not abuse her discretion in rejecting the Baumgardners' request for additional transportation expenses.

c. *Housing Repairs*

Petitioners argue that SO Covey abused her discretion by not reducing the QSV of the non-income-producing properties (114 E. and 137) by selling costs in the revised RCP and by disallowing future repair and maintenance expenses for the income-producing property (116 E.). Specifically, the Baumgardners asserted to SO Covey that the future repair and maintenance expenses for their income-producing property (116 E.) would exhaust their financial resources before the end of their joint life expectancy of not less than 15 years. In support of this assertion, they presented SO Covey with eight scenarios involving disposition of certain of their real estate properties and the resulting effect on their financial resources over their joint life expectancy of not less than 15 years. They argued that under each of the eight scenarios their financial resources would be exhausted before the end of their joint life expectancy and would render them unable to meet their basic living expenses.

The IRM directs an SO to determine an acceptable offer amount, based on economic hardship, by analyzing financial information and the hardship that would be created if certain assets, or a portion of certain assets, were used to pay the liability. IRM 5.8.11.5.3(1) (Oct. 4, 2019).

> Generally, it is the responsibility of the taxpayer to make
> decisions and take the appropriate actions needed to fund
> the acceptable offer amount. However, due consideration

---

[15] The exception that an allowance of a loan payment may be considered if the taxpayer provides evidence that the vehicle needs immediate replacement did not apply in this instance. The Baumgardners did not assert or provide evidence to SO Covey that either of their vehicles needed *immediate* replacement.

**[\*21]** of these funding options is often needed for the Service to arrive at an acceptable offer amount.

IRM 5.8.11.5.3(3). When a taxpayer has business assets, an SO reviewing such assets must determine whether certain assets are essential for the production of income. IRM 5.8.5.15(1) (Mar. 23, 2018). Generally, an SO will not include in the RCP the equity of income-producing assets unless the assets are not critical to business operations. IRM 5.8.5.15(3).

"For offer purposes, assets are valued at net realizable equity (NRE)." IRM 5.8.5.4.1(1). NRE is defined as QSV "less amounts owed to secured lien holders with priority over the federal tax lien, if applicable, and applicable exemption amounts." *Id*. IRM 5.8.5.4.1(2) defines QSV as an estimate of the price a seller could get for the asset in a situation where financial pressures motivate the owner to sell in a short time, typically 90 calendar days or less. Generally, QSV is calculated at 80% of an asset's fair market value (FMV). IRM 5.8.5.4.1(3). A higher or lower percentage may be applied in determining QSV depending on the type of asset and market conditions. *Id*. For instance, if the property would quickly sell at full FMV because real estate in the market is selling quickly or above listing price, then a higher percentage may be used. *Id*. An SO may reduce the NRE of an asset for the costs of the sale and the expected current year tax consequence of the sale. IRM 5.8.5.4.1(4). This reduction to NRE can occur only when an asset has been sold or is pending sale and the proceeds will be used to fund the offer. *Id*. If an SO reduces the NRE of an asset for the costs of the sale and the expected current year tax consequence, the actual sale price is used and there is no QSV reduction allowed. *Id*.

SO Covey reviewed the Baumgardners' documentation and determined that their mixed-use property (114 E.) and rental property (137) were not income-producing assets. She multiplied the FMV of each property they reported by 80% to determine the QSV. This figure was used to compute their equity in each of the non-income-producing properties. Our review of the relevant portions of the IRM and the administrative record shows that SO Covey's determinations to use the QSV for the non-income-producing properties for purposes of the revised

[*22] RCP was consistent with the IRM.[16] Additionally, SO Covey correctly calculated the NRE by not reducing the NRE of the non-income-producing properties for the costs of the sale and the expected current year tax consequences because neither 114 E. nor 137 was sold or had a sale pending. SO Covey's determination not to reduce the NRE for purposes of the revised RCP was consistent with the IRM. *See, e.g.*, *Gustashaw*, T.C. Memo. 2018-215, at *28.

Additionally, SO Covey determined that the Baumgardners' remaining real estate property, 116 E., was an income-producing asset. Consistent with the IRM, SO Covey excluded the equity in the income-producing property from the revised RCP. As discussed, petitioners assert that SO Covey abused her discretion in failing to reduce the RCP by the amount of estimated future repairs and expenses for 116 E. They assert that over the next 15 years 116 E. will require $116,275 in future repairs to maintain the property's building components. The repairs include boiler replacement, plumbing repairs, sidewalk replacement, laundry machine replacement, window air conditioner unit replacement, painting, siding replacement, roof replacement, garage roof replacement, fire escape post base replacement, driveway water runoff remediation, storm door replacement, installation of railings, installation of weed retention pavers, kitchen appliance and cabinet replacement, vinyl siding and trim replacement, exterior rear door replacement, downspout repairs, and garage door replacement.

Petitioners' argument with respect to SO Covey's refusal to include the future repairs and expenses for 116 E. in the revised RCP is the same type of argument that they made with respect to vehicle replacement and health care costs discussed *supra* Part II.B.2.a. and b. SO Covey considered the Baumgardners' reported future repair

---

[16] Petitioners, on brief, argue that SO Covey abused her discretion by not taking into account a reduction in financial resources because, if the Baumgardners' principal residence in 114 E. had been sold, they would have needed to obtain alternative comparable living arrangements. Petitioners assert that the Baumgardners would incur 100% of their housing and utility expense (which would be $2,059) whereas, if the property were not sold, they would have to incur only 61% of that expense because rental of 39% of the property defrays the expense. On the income and expense table SO Covey allowed the Baumgardners a housing and utility expense of $1,371. SO Covey's determination not to increase the housing and utility expense was not an abuse of discretion. They occupied 61% of the square footage of 114 E. and rented out the remainder, which was two garages. They did not occupy the 39% of the property that was rented and thus there is no reason that their housing and utility expense should be increased to account for a portion of 114 E. or a comparable property that they did not occupy and will not need in the future.

[*23] expenses for 116 E. and determined that they were speculative. We agree with respondent that any future repairs and expenses at 116 E. are speculative. Of the repairs or replacements allegedly needed over the next 15 years, some appear to be for cosmetic reasons (i.e., kitchen cabinets replacement, painting) while others depend on frequency and amount of use (i.e., kitchen appliances, laundry machines, air conditioning units). The Petition points to Examples 1 through 3 in Treasury Regulation § 301.7122-1(c)(3)(iii), which illustrate "the types of cases that may be compromised by the Secretary, at the Secretary's discretion, under the economic hardship provisions of [Treasury Regulation § 301.7122-1(b)(3)(i)]." The examples illustrate where an SO might exercise discretion to compromise a liability; however, the examples did not compel SO Covey to compromise the Baumgardners' liability in this case. *See, e.g.*, *Serna v. Commissioner*, T.C. Memo. 2022-66, at *9–10.

The base premise of each of the examples is that liquidation of an asset to satisfy a tax liability compromises the taxpayer's ability to pay basic living expenses or meet the taxpayer's or a dependent's medical needs. The Notice, Supplemental Notice, and the contemporaneous case activity record notes show that the SOs assigned to this case, including SO Covey, weighed these concerns. Specifically, SO Covey recalculated the Baumgardners' net available equity for purposes of the revised RCP and allowed them to retain net available equity in assets of $244,599 to subsidize their negative net monthly income and pay current and future basic living expenses for themselves and their adult dependent son. Our review of the administrative record does not reveal anything to disturb SO Covey's conclusion that the IRS could collect more than the $1,825 OIC without imposing economic hardship.

### d. *Life Insurance*

Petitioners assert that SO Covey erred by including the net equity of a whole life insurance policy for Mr. Baumgardner in the revised RCP. Consistent with their other arguments regarding future expenses, they assert that the inclusion of the net equity from the life insurance policy would exacerbate the economic hardship and result in inability to meet basic living expenses. Finally, they argue that the administrative record does not support IRS Appeals' allegations that the insurance policy was not accessed to pay for past or current expenses. In support of this argument, they point to the Form 433–A, which lists the insurance policy, its current cash value, and the loan balance from the policy.

[*24] IRM 5.8.5.9(2) (Sept. 24, 2021) provides that whole life insurance is not considered necessary. Because whole life insurance is treated as an investment, the insurance policy is an asset that must be valued for purposes of the RCP. If the taxpayer sells the policy, then the equity is the amount the taxpayer will receive from the sale of the policy. IRM 5.8.5.9(3). If the taxpayer retains or cashes out the policy, then the equity is the cash surrender value. IRM 5.8.5.9(3), 5.15.1.27(3) (Nov. 22, 2021). If the taxpayer borrows on the policy, then the equity is the cash loan value less any prior policy loans or automatic premium loans required to keep the contract in force. IRM 5.8.5.9(3), 5.15.1.27(3).

SO Covey used the insurance policy's net account value less loan and loan interest amounts to reach the net equity for purposes of the revised RCP. We note that this amount was less than each of (i) the cash surrender value of the policy or (ii) the loan amount available. Petitioners' primary argument that the inclusion of the life insurance policy in the revised RCP was in error is that the asset was needed for future expenses and that, contrary to SO Covey's allegation in the Supplemental Notice, it had been used to pay past expenses. The only support that we can find in the administrative record for their assertion is (i) the completed Form 433–A, which lists the insurance policy, its current cash value, and the loan balance from the policy, and (ii) a life insurance policy statement indicating the same. However, they do not point us to any other document in the administrative record that indicates what the loan proceeds were used for. Even if we assume that the loan proceeds were used to pay past basic living expenses, that by itself does not demonstrate that inclusion of the net equity from the insurance policy would cause economic hardship. Additionally, for the same reasons discussed *supra* Part II.B.2.a.–c., we reject their argument that access to this asset will be needed to pay future health care, vehicle replacement, and real estate repair and maintenance expenses. Based on the record that was before SO Covey we do not find that she abused her discretion by including net equity of the life insurance policy in the revised RCP.

Accordingly, we find that SO Covey's conclusion that the Baumgardners' offer amount did not reflect the full amount that the IRS could collect from them without causing economic hardship was not an abuse of discretion. The administrative record shows that SO Covey considered their arguments regarding their current and future basic living expenses and allowed them to retain net available equity in assets of $244,599 to subsidize their negative net monthly income and pay those basic living expenses. Ultimately, she reasonably determined that

[*25] their equity in assets exceeded their total tax liability such that they could fully satisfy the liability without economic hardship. As discussed, we do not substitute our judgment for that of the SO and, because SO Covey's conclusion was not arbitrary, capricious, or without sound basis in fact or law, we hold that SO Covey did not abuse her discretion in denying their offer amount of $1,825 for an OIC based on economic hardship.

### C.  *Balancing*

Section 6330(c)(3)(C) requires that an IRS Appeals officer consider whether the proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayers that any collection action be no more intrusive than necessary. SO Covey considered the proposed collection action, the Baumgardners' outstanding balance, their ability to pay an amount greater than the OIC offer amount, and that other collection alternatives were not viable options for consideration; and she concluded that the collection action was no more intrusive than necessary. The record supports SO Covey's conclusion, and the Court concludes that she did not abuse her discretion.

### III.  *Conclusion*

Petitioners have not shown that the SO's actions were arbitrary, capricious, or without sound basis in fact or law. Therefore, the SO did not abuse her discretion in rejecting the OIC-ETA based on economic hardship and in sustaining the proposed collection action.

We have considered all other arguments made and facts presented in reaching our decision, and, to the extent not discussed above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate decision will be entered.*